# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# MISSOULA DIVISION

| | |
|---|---|
| TRACIE R. BARNES, et al., | CV-26-53-BMM |
| Plaintiffs, | |
| v. | |
| BNSF RAILWAY CO., a Delaware corporation, | ORDER ON MOTION TO REMAND |
| Defendants. | |

## INTRODUCTION

Plaintiff Tracie R. Barnes, and plaintiffs in 215 additional cases (collectively "Libby Asbestos Cases"), sued Burlington Northern Santa Fe Railway Company ("BNSF") in Montana state court. (Doc. 1.) The first case was filed in Montana state court in 2013. (Doc. 6 at 7.) Barnes and the other plaintiffs in the Libby Asbestos Cases allege harm and damage resulting from their exposure to Libby amphibole asbestos as a result of BNSF's activities in Libby, Montana. (Doc. 8 Ex. 2.) BNSF removed the Libby Asbestos Cases to federal court on March 26, 2026. (Doc. 1.) Barnes opposes removal and asks the Court to remand the Libby Asbestos Cases to

1

Montana state court. (Doc. 21.) The Court held a hearing on June 11, 2026. (Doc. 31.)

## HISTORY

Vermiculite ore containing high concentrations of amphibole asbestos was intensively mined, processed, and shipped from Libby between 1923 and 1994. (Doc. 8 Ex. 2 at 3.) Vermiculite mining and transport operations resulted in the accumulation of significant asbestos contamination, in and around Libby, including airborne asbestos contamination. (*Id.*) BNSF's railyard in downtown Libby served as the hub of the railroad company's vermiculite business. (*Id*. at 21.)

Barnes alleges that BNSF transported asbestos laden vermiculite, loaded into rail cars from the vermiculite mine and along BNSF's "Libby Logger" line, to BNSF's railyard in downtown Libby. (*Id*. at 21, 28.) Barnes claims that BNSF transported from 193 million to four and one-half to five billion pounds of asbestos between 1925 and 1981. (*Id*. at 21-22.) Barnes notes that the asbestos shipped by BNSF into downtown Libby grew to 105,000 pounds per day in the late 1960s and 1970s, and up to 126,000 pounds of asbestos per day through the 1980s. (*Id.*)

Barnes bases these asbestos quantities on the range of asbestos content of the processed vermiculite that BNSF handled. (*Id*.) Barnes claims that the transport of such volumes of asbestos-ridden vermiculite resulted in significant accumulations of

2

asbestos-contaminated dust in the railyard and throughout Libby. (*Id*.) Barnes alleges that BNSF's activities caused exposure to extraordinarily high levels of asbestos in or near Libby. (*Id*. at 23.) Barnes contends that this exposure resulted, in significant part, from BNSF's negligent operation of its Libby loading facility, its Libby railyard, and its transportation of asbestos-contaminated vermiculite between its loading facility and the Libby railyard. (*Id.* at 27-29.)

Barnes asserts that a layer of asbestos-contaminated dust regularly coated the loading facility and the loaded rail cars. (*Id.* at 21.) Barnes alleges that BNSF's rail cars released visible clouds of contaminated dust as they traveled from BNSF's loading facility along the Libby Logger line to BNSF's railyard in Libby. (*Id*.) Barnes claims BNSF failed to contain this dust or otherwise prevent it from blowing through Libby's downtown and surrounding neighborhoods. Barnes attests that BNSF's failure exposed all Libby residents, not only railyard employees, to the harms from asbestos. (*Id*. at 27-29.) Barnes alleges certain BNSF's activities in the Libby vermiculite industry extended beyond its role as a common carrier that simply transported required goods. (*Id*. at 23.)

Barnes also claims BNSF knew of the dangers presented by asbestos exposure by at least the 1940s but failed to control the risk of asbestos dust pollution that regularly accumulated at BNSF's railyard. (*Id*. at 23-25.) Barnes bases his historic

3

estimates of asbestos concentrations, in part, on the presence of significant volumes of asbestos-contaminated waste even after the Libby cleanup efforts began in earnest in 2001. (*Id*.) "The Environmental Protection Agency has stated that the sources of asbestos contamination are, at least in part, from properties, railroad tracks, and rights of way owned, leased, and maintained by BNSF, [including the railyard]." (*Id.* at 22.)

Barnes was born in Libby in 1955 and has lived in Libby for his entire life except for eight months in Missoula, Montana in 1985. (*Id*. at 4.) Barnes has lived in various residences located near the railroad tracks in Libby. (*Id*.) Barnes rode his bike through piles of vermiculite at the downtown Libby railyard and bagging plant facility when he was a child between the years of 1961 to 1967. (*Id*.) Barnes played many years of little league and minor league baseball at the fields adjacent to the downtown Libby railyard. Barnes's baseball playing exposed him to loose vermiculite between the years of 1961 to 1973. (*Id*.) Barnes walked the railroad tracks while bird hunting in the fall from the years of 1969 to 1973. (*Id*.) Barnes recalls loose vermiculite along and between the tracks and passing trains with clouds of dust coming off the cars and stirring vermiculite along the tracks. (*Id*.)

Barnes often found himself through his life and employment in Libby near BNSF's property where asbestos fibers were being entrained. (*Id*.) The Great Northern Railroad employed Barnes's father from 1949 to 1950 and from 1952 to

1963. (*Id.* at 4-5.) Barnes's father spent much of his time in the downtown Libby railyard checking and weighing railcars, including vermiculite cars. (*Id.* at 5.) Barnes's father regularly would come home from the Libby railyard with asbestos fibers on his clothes. (*Id.*) Barnes now suffers from asbestos disease and asbestos related bodily injuries. (*Id.* at 29, 30.)

Barnes, and plaintiffs in the 215 Libby Asbestos Cases, sued BNSF in Montana state court based on these allegations. (Doc. 1.) Plaintiffs filed the first case in Montana state court in 2013. (Doc. 6 at 7.) The Montana Supreme Court consolidated the Libby Asbestos Cases into the Montana Asbestos Claims Court ("ACC"). (*Id.* at 8.) ACC Judge Amy Eddy designated *Barnes v. BNSF* ("*Barnes*") as the lead case to resolve common issues of law involving BNSF. (*Id.*, citing *In re Asbestos Litigation*, Cause No. AC 17-0694, Order Setting Lead Case of *Barnes, et al v. BNSF* (Mont. Twenty-Third Jud. Dist. Ct. Mar. 20, 2018).) BNSF petitioned for, and was granted, a writ of supervisory control to the Montana Supreme Court in *Barnes* while these cases were pending in Montana's ACC. (*Id.*) The Montana Supreme Court and ACC Judge Amy Eddy already have decided numerous important issues within these proceedings. (*Id.* at 8-9 (referencing orders).)

*Wells & Walder v. BNSF*, Case 4:21-cv-00097-BMM (D. Mont.) ("*Wells*") represented the first Libby-related asbestos case brought by a community member to

go to trial. (*Id*. at 9.) The Court conducted a 10-day jury trial in *Wells* from April 8, 2024, to April 19, 2024. *See Wells*, at Doc. 388. The jury returned a verdict that found BNSF to be strictly liable for the abnormally dangerous activity of transporting vermiculite that caused the mesothelioma and deaths of the two plaintiffs, Tom Wells and Joyce Walder. *Id*. at Doc. 389. The jury awarded $4,000,000 in compensatory damages to each plaintiff. *Id*. The jury also concluded the plaintiffs had failed to prove that BNSF had been negligent in its operations. *Id*. BNSF appealed the judgment on August 5, 2024. *Id*. at Doc. 436.

The Ninth Circuit reversed on February 24, 2026. The Ninth Circuit remanded with instructions to enter judgment for BNSF. *Wells v. BNSF Ry. Co.*, 168 F.4th 574 (9th Cir. 2026) ("*Wells/Walder* opinion"). The Ninth Circuit determined that the common carrier exception protected BNSF from the plaintiffs' strict liability claims related to the abnormally dangerous activity of BNSF's transportation of vermiculite in and around Libby. *Id*. BNSF removed the Libby Asbestos Cases to federal court on March 26, 2026. (Doc. 1.) BNSF filed motions for judgment on the pleadings in the Libby Asbestos Cases with the motion in this case being filed on March 30, 2026. (Doc. 2.) BNSF also filed a motion for judgment on the pleadings in a related case that previously had been stayed in Montana federal court. *See Gallegos* v. *BNSF*, Case 9:22-cv-68-BMM, at Doc. 145 ("*Gallegos*"). The Court consolidated the 216

6

Libby Asbestos Cases pursuant to the parties' stipulated motion on May 19, 2026. (Doc. 20.) *Gallegos* remains separate from the consolidated Libby Asbestos Cases.

**LEGAL STANDARD**

Federal courts exercise limited jurisdiction and possess only that power authorized by the Constitution and statute. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Federal law permits removal of civil actions from state court only when the federal court has original jurisdiction over the action, and removal would not otherwise be expressly prohibited by statute. 28 U.S.C. § 1441. Federal district courts generally have original jurisdiction over actions "arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, and in actions where complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.00. 28 U.S.C. § 1332. Federal law also permits removal pursuant to federal officer removal. 28 U.S.C. § 1442.

Courts must strictly construe removal statutes. *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108-09 (1941). "It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377 (internal citation omitted). The presumption against removal jurisdiction "means that the defendant always has the burden of establishing that removal is proper." *Gaus v. Miles, Inc.*, 980 F.2d 564,

566 (9th Cir. 1992). Any doubts about federal jurisdiction should be resolved in favor of remand. *Id.* Courts strictly construe removal jurisdiction in favor of remand. *See Harris v. Bankers Life and Cas. Co.*, 425 F.3d 689, 698 (9th Cir. 2005).

Federal question jurisdiction "exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint" under the well-pleaded complaint rule. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). It remains well-settled that removal must be based on the plaintiff's claims and not on a federal defense, including a defense of preemption. *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 13-14 (1983). "As a general rule, absent diversity jurisdiction, a case will not be removable if the complaint does not affirmatively allege a federal claim." *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003). Removal must be timely. 28 U.S.C.A. § 1446(b). Remand to state court may be ordered for lack of subject matter jurisdiction or any defect in the removal procedure. *See* 28 U.S.C. § 1447(c).

## DISCUSSION

Two pathways exist to removal, and a thirty-day deadline governs each one. 28 U.S.C. § 1446(b); *Dietrich v. Boeing Co.*, 14 F.4th 1089, 1090 (9th Cir. 2021). The first and most common pathway arises where the basis for removal appears clear from the complaint or other initial pleading. 28 U.S.C. § 1446(b). In those cases, the

8

thirty-day removal period begins "to run from the date a defendant receives the initial pleading." *Dietrich*, 14 F.4th at 1090 (citing 28 U.S.C. § 1446(b)(1)); *see also Harris*, 425 F.3d at 694. The second pathway opens "if the case stated by the initial pleading is not removable," but the defendant later receives an "amended pleading, motion, order, or other paper" that makes it clear that the case "is or has become removable." 28 U.S.C. § 1446(b)(3); *Deitrich*, 14 F.4th at 1090. *Deitrich* established that the second pathway requires a document that makes it "unequivocally clear and certain" that grounds for removal now exist. 14 F.4th at 1095. "*Dietrich* and its progeny only apply to cases where the initial pleading does not 'set forth' a basis for federal jurisdiction." *Givens v. Lawson*, No. 3:22-CV-00772-YY, 2022 WL 4586250, at \*3 (D. Or. Aug. 30, 2022), *report and recommendation adopted*, No. 3:22-CV-00772-YY, 2022 WL 4551533 (D. Or. Sept. 27, 2022).

The Court questions whether this action proved properly removable earlier based upon federal diversity jurisdiction. *See* 28 U.S.C. § 1446(b)(3). A court generally has diversity jurisdiction only when complete diversity of citizenship among adverse parties exists and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332(a). The Court observes that complete diversity existed in this action after the State of Montana and John Swing were removed as defendants. The remaining parties in this action are Plaintiff Barnes, a resident and citizen of Montana,

9

and Defendant BNSF, a corporation incorporated in Delaware and headquartered in Texas. (Doc. 8 Ex. 2.) The amount in controversy indisputably exceeds $75,000.

The parties did not extensively address federal diversity jurisdiction in their briefing or at the hearing. BNSF filed a sur-reply following the hearing that briefly argues this action is not, and has not been, removable based upon federal diversity jurisdiction. (Doc. 33 at 3.) BNSF argues first it proves unclear whether BNSF properly could have removed the case to federal court after complete diversity became apparent following Mr. Swing's death in 2025. (*Id.* at 3.) BNSF further asserts the action remains removable based upon federal officer jurisdiction even if it previously proved removable based upon federal diversity jurisdiction. (*Id.*, citing *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247 (9th Cir. 2006).)

BNSF specifically argues that "[Ninth] Circuit precedent makes clear that removal on one ground does not start the clock for removal as to other grounds." (*Id.*, citing *Durham*, 445 F.3d at 1253.) The Court notes that *Durham* only extends the removal clock for removal based on federal officer jurisdiction grounds. Federal officer jurisdiction remains subject to § 1442's "liberal interpretation to [§] 1446," as opposed to removal under § 1441 which is "strictly construed against federal court jurisdiction." *Durham*, 445 F.3d at 1253. The Court notes that § 1446(b)(3) of Title 28 applies only "where the initial pleading does not 'set forth' a basis for federal

10

jurisdiction." *Givens*, 2022 WL 4586250, at *3.

It follows that § 1446(b)(3) also proves unavailable after the limited removal period has passed based on an "amended pleading, motion, order, or other paper" that had made it clear that the case "is or ha[d] become removable." 28 U.S.C. § 1446(b)(3); *Deitrich*, 14 F.4th at 1090. "Removal is timely only if filed within thirty days after the defendant receives a pleading or other paper that clearly establishes the basis for federal jurisdiction." *Araujo v. Gen. Motors LLC*, No. 5:26-CV-00012-SSS-SPX, 2026 WL 622291, at *2 (C.D. Cal. Mar. 5, 2026) (citing 28 U.S.C. § 1446(b)(1)). "Failure to comply with this thirty-day requirement renders removal procedurally defective and requires remand under 28 U.S.C. § 1447(c)." *Id*.

For those reasons, the Court determines that an extension of the removal clock for federal officer jurisdiction provides an exception to the typical rule that defendants may not remove an action to federal court if grounds for proper removal previously existed and the defendants had failed to take advantage of the opportunity. The Court determines it unnecessary to provide a conclusion regarding the timeliness of BNSF's removal based on the issue of diversity jurisdiction. The Court instead will address whether the Ninth Circuit opinion in *Wells/Walder* constitutes a document that makes it "unequivocally clear and certain" that grounds for removal now exist. *Deitrich*, 14 F.4th at 1095. BNSF argues that the *Wells/Walder* opinion

11

provides two routes for federal court jurisdiction: embedded federal question jurisdiction, or arising under jurisdiction, and federal officer jurisdiction. (Doc. 21 at 10, 19.)

## I.      Arising Under/Federal Question Jurisdiction

BNSF first argues that the *Wells/Walder* opinion verified Barnes's complaint contains an embedded federal question. (*Id*. at 10.) BNSF cites *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 379 n.9 (2012), and *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005), to support its contention. (*Id*.) *Grable* concludes federal arising-under jurisdiction exists where "a state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." 545 U.S. at 314.

The U.S. Supreme Court has referred to arising-under cases as a "special and small category." *Empire Healthchoice Assurance, Inc. v. McVeigh,* 547 U.S. 677, 699 (2006). The U.S. Supreme Court has provided a four-part test to determine when arising under jurisdiction exists. "[F]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013). "Where all four

of these requirements are met, [the U.S. Supreme Court held], jurisdiction is proper because there is a 'serious federal interest in claiming the advantages thought to be inherent in a federal forum,' which can be vindicated without disrupting Congress's intended division of labor between state and federal courts." *Id.* (quoting *Grable*, 545 U.S., at 313-314.)

BNSF argues whether BNSF's alleged contamination of the Libby Railyard constitutes "transportation" pursuant to 49 U.S.C. § 10102(9) presents an embedded federal question. (Doc. 21 at 13.) BNSF asserts it qualifies as a common carrier with a "federally imposed duty to provide transportation services upon reasonable request" pursuant to 49 U.S.C. § 11101(a). (*Id.* at 12-13.) BNSF contends the *Wells/Walder* opinion addressed "whether BNSF was acting pursuant to its federally imposed duty under 49 U.S.C. § 11101(a) to transport vermiculite when it allegedly 'failed to maintain its railyard and tracks where asbestos collected.'" (*Id.* at 13, quoting *Wells/Walder*, 168 F.4th at 580.) BNSF highlights the Ninth Circuit's citations to the definition of transportation under 49 U.S.C. § 10102(9) and BNSF's common carrier duty under § 11101(a). (Doc. 21 at 14, citing *Wells/Walder*, 168 F.4th at 581.)

It remains "settled law that a case may *not* be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the

13

federal defense is the only question truly at issue." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987), *citing Franchise Tax Bd. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 12 (1983) (emphasis in original). "Even assuming that these inquiries implicate questions of federal law, a federal issue raised in anticipation of a defense is not sufficient to establish federal question jurisdiction." *Negrete v. City of Oakland*, 46 F.4th 811, 819–20 (9th Cir. 2022).

"[T]he question whether a claim 'arises under' federal law must be determined by reference to the 'well-pleaded complaint.'" *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 808 (1986), *quoting Franchise Tax Bd.*, 463 U.S. at 9-10. "A defense that raises a federal question is inadequate to confer federal jurisdiction." *Id.* Courts must consider instead whether a party necessarily raised an issue as a defense. The answer depends on whether the issue represents "an essential element" of a plaintiff's claim. *Grable*, 545 U.S. at 315.

BNSF argues that the common carrier exception potentially provides a defense to Barnes's claims. BNSF fails to explain how it avoids the well-pleaded complaint rule. The Court does not see how it properly may exercise federal jurisdiction over this action based on the alleged federal nature of BNSF's common carrier defense. The common carrier exception provides a defense that allegedly raises a federal question which typically does not "confer federal jurisdiction." *Merrill Dow Pharms,*

14

*Inc.*, 478 U.S. at 808 (citations omitted). The Court nonetheless will address the *Gunn* factors.

The question of whether the party "necessarily raised" the federal issue represents the first element in the four-part test. *Gunn*, 568 U.S. at 258. The Court agrees that the scope of BNSF's common carrier exception proves necessarily raised. The Court acknowledges that *Wells/Walder* and the many other Libby asbestos cases had litigated the issue of BNSF's common carrier exception for many years. The Court recognizes the Montana Supreme Court adopted the common carrier exception as a matter of state law in *BNSF Ry. Co. v. Eddy*, 459 P.3d 857 (Mont. 2020). *Eddy* further cited 49 U.S.C. § 11101(a) in its discussion of the role of a common carrier and the scope of the exception. *Id*. at 874.

The Court notes the *Wells/Walder* opinion further discussed the scope of the common carrier exception. The application of the common carrier exception and the use of federal statute 49 U.S.C. § 11101, do not prove to be new or novel. The Court highlights this point as it appears to demonstrate another instance when removability potentially may have become available to BNSF under its own theory based on 28 U.S.C. § 1446(b)(3). BNSF failed to remove any cases to federal court after the *Eddy* opinion. BNSF has argued that the federal definition of transportation should apply before this removal which suggests that it previously had ascertained its asserted

15

grounds for removal. *See e.g.* BNSF's MSJ Response in *Funk v. BNSF*, Mont. Twenty-Third Jud. Dist. Cause No. DV-23-005 (Dec. 1, 2023)), p. 21, 24. BNSF's failure, at worst, further demonstrates that the removal clock has run and, at best, undermines its own arguments about the appropriateness of removability now.

Regardless, the Court agrees that the issue of the scope of the common carrier exception necessarily has been raised in this action. The Court disagrees, however, with BNSF's argument that the federal issue, or the dispute over application of the federal definition of transportation to the common carrier exception, proves necessarily raised. The common carrier exception falls within state common law. States have the authority, in the first place, to adopt the common carrier exception to strict liability. Such authority naturally extends to the power to define its scope. States are under no duty to apply federal law or even consider application of specific federal laws as they craft their common carrier doctrine. BNSF has failed to demonstrate persuasively how the federal issue in this action proves "necessarily raised."

The Court concludes that BNSF meets the second element of the test as the federal question at issue here proves "actually disputed." *Gunn*, 568 U.S. at 258. Barnes disagrees and argues that no genuine controversy exists "respecting the validity, construction, or effect of" the federal law itself. (Doc. 23 at 8, citing *Grable*, 545 U.S. at 351 n.3.) The Court agrees that no dispute exists over the construction of

16

the federal statute. The Court concludes that a dispute exists over the effect of, or application of, the federal statute to state common law. This dispute proves sufficient to meet the second element of the *Gunn* test.

The third element addresses whether the federal issue proves substantial. *Id*. "[I]t is not enough that the federal issue be significant to the particular parties in the immediate suit; that will *always* be true when the state claim 'necessarily raises' a disputed federal issue, as *Grable* separately requires. The substantiality inquiry under *Grable* looks instead to the importance of the issue to the federal system as a whole." *Id*. at 260. The Court remains skeptical whether this question presents a substantial issue "to the federal system as a whole." *Id*.

The claim presents the narrow question of whether BNSF's activities at the Libby railyard fall within the scope of the common carrier exception. The Court need not issue a broad decision defining the scope of the federal definition of transportation to resolve this dispute. BNSF characterizes the question as "whether an interstate common carrier is entitled to the federal definition of transportation for activities conducted pursuant to its federally imposed public duties, and, whether its activities fall within that definition." (Doc. 21 at 16.) BNSF cites the concurring opinion in *Wells/Walder* that focuses on the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"). (*Id*., citing *Wells/Walder*, 168 F.4th at 584.) The Court disagrees

17

with BNSF's framing of the issue.

The majority opinion in *Wells/Walder* declined to rely on ICCTA in its decision and analysis. *See generally Wells/Walder*, 168 F.4th at 577-584 (citing 49 U.S.C. § 10102(9) but not citing 49 U.S.C. § 10501(a)). The Ninth Circuit majority specifically cautioned that it declined to reach the ICCTA issue, or to expound upon ICCTA's potential preemption of other state laws like negligence. *Id*. at 580 n.2. The majority explained that "[t]he common carrier exception provides a simpler ground for resolution of this appeal and does not implicate the same federalism concerns that attend preemption of state laws of general applicability." *Id*. The Ninth Circuit's statement impliedly appears to recognize the state-law-based nature of these claims and the importance of common carrier law as a state issue rather than a federal one.

The issue in *Grable* related to the Internal Revenue Service ("IRS") seizing property from the plaintiff and selling it to satisfy the plaintiff's federal tax delinquency. 545 U.S., at 310-311. The plaintiff filed a state law quiet title action five years later against the third-party that had purchased the property. *Id*. The plaintiff alleged the IRS had failed to comply with certain federally imposed notice requirements and thereby rendered invalid the seizure and sale. *Id*. The U.S. Supreme Court concluded that the federal issue proved substantially important because it related to the validity of an administrative action and the government's "strong

interest" in being able to recover delinquent taxes through seizure and sale of property. *Id*. at 315. No such administrative action exists here. No party challenges the validity of any decision by the federal government or the federal government's alleged noncompliance with a federal statute.

The U.S. Supreme Court in *Gunn* addresses *Grable*, in addition to *Smith v. Kansas City Title & Trust Co.,* 255 U.S. 180 (1921), which involved a claim that the "defendant bank could not purchase certain bonds issued by the Federal Government because the Government had acted unconstitutionally in issuing them." *Gunn*, 568 U.S. at 261 (citing *Smith,* 255 U.S. at 198). The issue warranted federal jurisdiction as "the constitutional validity of an act of Congress [was] directly drawn in question." *Gunn*, 568 U.S. at 261 (citing *Smith,* 255 U.S. at 201). The U.S. Supreme Court has described *Grable* as presenting a "nearly 'pure issue of law' [and] one 'that could be settled once and for all and thereafter would govern numerous tax sale cases.'" *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 700 (2006).

The U.S. Supreme Court rejected federal jurisdiction over cases that may contain federal issues but remain "fact-bound and situation-specific." *Id*. at 701. The U.S. Supreme Court directed that cases must contain more than a "federal element" and related federal interests to justify federal jurisdiction under this doctrine. *Id*. The U.S. Supreme Court further recognized that "[t]he state court in which the [] suit was

lodged is competent to apply federal law, to the extent it is relevant, and would seem best positioned to determine the [issue]." *Id*.

The Court notes the scope and application of the common carrier exception from the *Restatement (Second) of Torts*, § 521, precisely provides a "fact-bound and situation-specific" inquiry. *Id*. The Ninth Circuit also has reiterated federal arising under jurisdiction proves improper for claims that require "fact-intensive and situation-specific" analysis. *See Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 748 (9th Cir. 2022). *City of Oakland v. BP PLC* concluded federal jurisdiction is lacking where a case requires "a fact-specific application of rules that come from both federal and state law rather than a context-free inquiry into the meaning of a federal law." 969 F.3d 895, 907 (9th Cir. 2020) (citing *Bennett v. Sw. Airlines Co.*, 484 F.3d 907, 910 (7th Cir. 2007)). Courts in similar cases would need to conduct specific and detailed analyses into each claim to determine whether the common carrier's actions fell within the scope regardless of what any court in this litigation would conclude as to the proper definition of transportation. Numerous courts already have opined upon the scope of the common carrier exception, so the issue does not stand as one of first impression. *See e.g.*, *Eddy*, 459 P.3d at 874-875.

The ongoing and extensive discussion over the scope and application of the common carrier exception to the Libby Asbestos Cases proves that the issue is highly

20

fact specific. The Court remains unconvinced that "allowing state courts to resolve these cases [would] undermine 'the development of a uniform body of law.'" *Gunn*, 568 U.S. at 261 (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 162 (1989)). The Court recognizes the importance of the question to this action but remains unpersuaded of the substantial significance of this issue beyond the Libby Asbestos Cases.

The last element of the *Gunn* test concerns the "appropriate 'balance of federal and state judicial responsibilities.'" *Gunn*, 568 U.S. at 264 (citing *Grable*, 545 U.S. at 314). States have an interest in enforcing state common laws of strict liability and negligence. Congress has enumerated the interests of the federal government as they relate to railroad transportation but specifically has limited the reach of federal jurisdiction in the subject area. Congress could have expressly extended ICCTA to cover all state tort law claims. In fact, Congress typically must make its intent "'unmistakably clear' when enacting statutes that would alter the usual constitutional balance between the Federal Government and the States." *Hayden v. Pataki*, 449 F.3d 305, 323 (2d Cir. 2006) (internal quotation marks omitted) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)). States consistently have adjudicated issues concerning strict liability and negligence even as they relate to federal issues. The Court sees no substantial reason to disrupt this balance now.

21

*Grable* directs that courts may not "treat[] 'federal issue' as a password opening federal courts to any state action embracing a point of federal law." 568 U.S. at 314. The Court fails to see how BNSF sufficiently meets the four-part test under *Gunn*. The Court determines that it would prove inappropriate for the Court to exercise arising under federal question jurisdiction over this action at this time.

## II.    Federal Officer Jurisdiction

"Under the federal officer removal statute, a removing defendant must satisfy three requirements. First, the removing defendant must be the United States, a federal agency, a federal officer, or a person 'acting under' a federal officer, such as certain private parties hired to assist federal officers." *Chevron USA Inc. v. Plaquemines Par., Louisiana*, 146 S. Ct. 1052, 1057 (2026) (citing *Watson v. Philip Morris Cos.*, 551 U.S. 142, 148–153 (2007)). "Second, the suit must be 'for or relating to any act under color of such office.'" *Chevron USA Inc.*, 146 S. Ct. at 1057 (quoting 28 U.S.C. § 1442(a)(1)). "Third, the removing defendant must assert 'a colorable federal defense.'" *Id.* at 1057-58 (quoting *Mesa v. California*, 489 U.S. 121, 129 (1989)).

BNSF argues it acted under a federal officer when transporting vermiculite for use by the U.S. Navy. (Doc. 21 at 19.) A person "acting under" a federal officer must be "involved in 'an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior.'" *Doe v. Cedars-Sinai Health Sys.*, 106 F.4th 907, 913 (9th Cir.

22

2024) (quoting *Goncalves ex rel. Goncalves v. Rady Childs. Hosp. San Diego*, 865 F.3d 1237, 1245 (9th Cir. 2017) (quoting *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 152 (2007))). "The mere 'fact that a federal regulatory agency directs, supervises, and monitors a company's activities in considerable detail' does not mean the company acts under a federal officer for removal purposes." *Doe*, 106 F.4th at 913 (quoting *Watson*, 551 U.S. at 152). "Something more must be present, like the 'delegation of legal authority,' which might include 'evidence of any contract, any payment, any employer/employee relationship, or any principal/agent arrangement.'" *Doe*, 106 F.4th at 913 (quoting *Watson*, 551 U.S. at 156). BNSF alleges that it provided vermiculite to the U.S. Navy pursuant to a contractual agreement. (Doc. 21 at 20.) The Court remains skeptical whether this connection proves sufficient to demonstrate the required relationship.

Courts typically require the defendant be acting as a government agent and often look for facts indicating "close direction or supervision." *City & County of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1108 (9th Cir. 2022) (holding that removing defendants did not act "under" a federal officer because they "did not serve as government *agents* and were not subject to close direction or supervision") (emphasis added), *cert. denied*, 143 S. Ct. 1795 (2023)). *Goncalves* involved a medical malpractice action in which a federal health insurance plan covered the patient's

23

father. 865 F.3d at 1242-43. The Ninth Circuit, in allowing removal under the federal officer removal statute, "relied on 'the interconnectedness' between the government and the administrators in operating and administering the plan, [] as a[] [federal] agency was 'responsible for the overall administration of the program while sharing the day-to-day operating responsibility with . . . the [defendants].'" *DeFiore v. SOC LLC*, 85 F.4th 546, 555 (9th Cir. 2023) (quoting *Goncalves*, 865 F.3d at 1246-47).

The Ninth Circuit in *Cabalce v. Thomas E. Blanchard & Associates*, 797 F.3d 720, 728 (9th Cir. 2015), determined that an independent contractor hired by the government to store and dispose of seized fireworks had not acted under a federal officer because of "the lack of any evidence of the requisite federal control or supervision over the handling of the seized fireworks." The contract provided for "some general oversight by the government," but it had "delegated to the defendants" "specific command and control supervision" of the guards. *Id*.

*Defiore*, in contrast, involved contracted guards at U.S. military bases in Iraq. 85 F.4th at 555. The contracted guards were "acting under federal authority by performing security services according to United States military directives." *Id*. at 556. The contracted guards had "to follow orders issued by the Combatant Commander, including those related to force protection, security, health, or safety." *Id*. (cleaned up). The contracted guards even could be ordered into combat to repel

24

an enemy attack. *Id*. No similar facts exist here.

The Fifth Circuit considered a somewhat similar issue in *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398 (5th Cir. 1998), *holding modified by Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286 (5th Cir. 2020). The plaintiff in *Winters* had sued the producer of Agent Orange, a chemical used by the U.S. Department of Defense when the plaintiff had served as a nurse in Vietnam during the Vietnam War. *Winters*, 149 F.3d at 398. The Fifth Circuit concluded federal officer jurisdiction proved appropriate because the federal government "maintained strict control over the development and subsequent production of Agent Orange." *Id*. at 399. The Fifth Circuit noted the corporation had manufactured and sold various similar products for years, but it had "*never manufactured or registered 'Agent Orange' for domestic use either prior to or after making 'Agent Orange' for the Government.*" *Id*. (emphasis in original). The government further exercised control over the "packaging, labeling and shipping of 'Agent Orange.'" *Id*.

BNSF has provided no evidence it operated under specific direction, control, or supervision by the U.S. Navy. BNSF presented no evidence it had any contracts with the U.S. Navy. BNSF had contracts with W.R. Grace to transport vermiculite that W.R. Grace had agreed to provide to the U.S. Navy. BNSF merely shipped vermiculite from Libby to U.S. Navy bases through contracted commercial

25

operations. BNSF provides no evidence of the government exercising direct control over the vermiculite product or shipping. BNSF instead provides evidence that the U.S. Navy sought to purchase a previously provided grade of vermiculite for plaster in its ships. (Doc. 21 at 20-21.) The U.S. Navy's specifications required use of this specific grade of vermiculite but in no way directed or supervised W.R. Grace's production of vermiculite in Libby or BNSF's transfer of this vermiculite from Libby. (*Id*. at 21-22.) This relationship proves to be closer to that of a non-agent service provider than a government agent. *See DeFiore*, 85 F.4th at 555.

BNSF next argues that its role as a common carrier provided the supervision and oversight by the federal government required to demonstrate federal officer jurisdiction. (Doc. 21 at 23-26.) BNSF provides no authority to support this argument in the federal officer jurisdiction context beyond one citation to a case that found jurisdiction in an unrelated action over defendants who "were federal officers when their actions were taken as part of a spill cleanup supervised by the Coast Guard to protect the public welfare." (*Id*. at 25-26, citing *People of State of Calif. v. H&H Ship*, No. 94-10182, 1995 WL 619293, at *1-2 (9th Cir. Oct. 17, 1995).)

The U.S. Supreme Court and the Ninth Circuit additionally have disposed of this argument by emphasizing that compliance with federal regulations, even in "considerable detail" or with "highly complex orders[s]," does not prove sufficient

26

to demonstrate that a company acted under a federal officer. *Riggs v. Airbus Helicopters, Inc.*, 939 F.3d 981, 987 (9th Cir. 2019) (quoting *Watson*, 551 U.S. at 152-53). "Simple compliance with the law . . . does not meet the 'acting under' standard." *Riggs*, 939 F.3d at 989 (citing *Goncalves*, 865 F.3d at 1247). The Ninth Circuit further stated that "neither an arm's-length business arrangement with the federal government nor supplying it with widely available commercial products or services are enough to show 'acting under' a federal officer." *City & County of Honolulu*, 39 F.4th at 1107 (cleaned up) (internal citation omitted). The Court finds unpersuasive BNSF's argument. BNSF transported vermiculite, and other hazardous materials, as part of its duty as a common carrier. BNSF provides no additional evidence how this duty constitutes sufficient federal direction, supervision, or direct control as courts typically require in finding federal officer jurisdiction.

The Court will continue to address the remaining elements of the federal officer jurisdiction test. The next element of the test examines whether the suit must be "for or relating to any act under color of such office." *Chevron USA Inc.*, 146 S. Ct. at 1058 (quoting 28 U.S.C. § 1442(a)(1)). "The phrase 'relating to' sweeps broadly," and "a removing defendant need not show that his federal duties specifically required or strictly caused the challenged conduct." *Griffin v. Optum, Inc.*, No. 25-1165, 2026 WL 1239289, at *3 (8th Cir. May 6, 2026) (quoting *Chevron*

27

*USA Inc.*, 146 S. Ct. at 1059-61). "It is sufficient that a defendant plausibly alleges 'a close relationship between its challenged conduct and the performance of its federal duties.'" *Griffin*, 2026 WL 1239289, at *3 (quoting *Chevron USA Inc.*, 146 S. Ct. at 1059-61).

Congress amended 28 U.S.C. § 1442(a)(1) in 2011 to change the language from "*for* 'an act under color of office'" to "*relating to*." *Chevron USA Inc.*, 146 S. Ct. at 1066, n.3 (discussing 2011 amendment) (emphasis added). Case law before this amendment, and generally before *Chevron*, interpreted the second element of the test to require a removing defendant to "show a nexus, a 'causal connection' between the charged conduct and asserted official authority.'" *Id*. (quoting *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999) (superseded by *Chevron*)); *see also Latiolais*, 951 F.3d at 292 (discussing amended law and erroneous tendency within courts to rely on the old standard even after the amendment). As a result, much of the earlier case law proves relatively unhelpful in interpreting this second element.

The next question addresses whether BNSF's challenged acts, the acts that comprise the subject of this action, relate to BNSF's alleged federal duties. BNSF's challenged acts involve its allegedly negligent operation of its Libby loading facility and its Libby railyard, and its transportation of asbestos-contaminated vermiculite between its loading facility and railyard. More generally, the acts that are the subjects

28

of this action involve BNSF's activities in the Libby railyard that contributed to widespread asbestos contamination in Libby. These activities are related, at least in part, to BNSF's federal duties to transport vermiculite to the U.S. Navy. The Court does not see how this tenuous connection proves sufficient for the purposes of this test.

*Chevron* provides helpful guidance. 146 S. Ct. at 1057. The plaintiff in *Chevron* sued Chevron based on its production of crude oil during World War II. *Id*. The federal government had entered an aviation gas refining contract with a predecessor of Chevron because it desperately needed increased production of aviation gas, of which crude oil represented a crucial component. *Id*. The federal government created the Petroleum Administration for War (P.A.W.) "to ensure that the United States would have enough fuel to win the war." *Id*. Chevron agreed to work "day and night" to quadruple its aviation gas refining capacity at its Texas refinery and agreed that the government "at any time" could purchase all of Chevron's excess aviation gas. *Id*.

The government's contract clearly contemplated production of crude oil and adjusted the price of aviation gas based on the cost of obtaining crude oil. *Id*. The federal government "allocated crude oil to specific refiners to maximize output." *Id*. The federal government also "required production methods that increased crude-oil

production, such as vertical drilling." *Id*. This crude oil production damaged coastal areas, and the plaintiffs alleged that this production often had been undertaken without proper permitting. *Id*.

*Chevron* concluded that these allegations, based on 1940s crude-oil production, related to Chevron's contractual duties to refine crude oil into aviation gas for the military at the same time. *Id*. "Much of the crude oil that Chevron produced in the [relevant] field was ultimately used for its own [aviation gas] refining." *Id*. Notably, not all the crude oil appears to have been used for production of aviation gas. The federal government remained highly involved in what the U.S. Supreme Court described as an "all-hands-on-deck, wartime" effort to drastically increase aviation gas production. *Id*.

BNSF presents very few similar facts here. BNSF introduces no evidence of extensive contracting, administrative bodies dedicated to the subject, or intense involvement by the federal government in the mining and refinement of vermiculite. Another notable difference between *Chevron* and this case is that "much" of Chevron's crude oil production went directly into aviation gas for the war. *Id*. BNSF provides no evidence about the percentage of vermiculite it provided to the U.S. Navy as compared to other non-related uses. Even more notably, the allegations in *Chevron* focused specifically on actions in the 1940s around World War II, whereas the

30

allegations here span decades of time and undisputably involve periods where BNSF was providing no vermiculite to the U.S. Navy, or the nation was in a period of peacetime rather than wartime. *Id*.

*Chevron* noted that though the "relating to" requirement "sweeps broadly," and may involve "indirect" connections, limits remain and the requirement "is not 'so broad that it is meaningless.'" *Id*. (quoting *Rutledge v. Pharmaceutical Care Management Assn.*, 592 U.S. 80, 93 (2020) (Thomas, J., concurring)). "The ordinary understanding of 'relating to' requires a connection that is not 'tenuous, remote, or peripheral.'" *Rutledge*, 592 U.S. at 94 (2020) (Thomas, J., concurring) (internal quotation marks omitted). The U.S. Supreme Court emphasized that the ordinary and proper interpretation of "the federal officer removal statute [would not] [] reach all suits with any attenuated connection to federal duties." *Id*.

*Chevron* cites a case from the D.C. Circuit where the court held that "a false-advertising suit targeting an oil company's statements to consumers about the future effects of fossil fuels on climate change did not relate to its decades-earlier production for the Government." *Id*. (citing *D.C. v. Exxon Mobil Corp.*, 89 F.4th 144, 156 (D.C. Cir. 2023) ("There is simply no relationship between actions taken by the Companies' predecessors in the 1940s and 1950s and the allegedly deceptive statements made by the Companies about climate change since 1980."). The Court determines that BNSF

31

has provided insufficient evidence to demonstrate anything more than a tenuous and remote relationship between the challenged activities and the use of vermiculite from Libby by the U.S. Navy, the U.S. Coast Guard, and the U.S. Maritime Administration from the 1940s to 1976.

The last requirement of the federal officer jurisdiction test requires that "the removing defendant must assert 'a colorable federal defense.'" *Chevron USA Inc.*, 146 S. Ct. at 1057-58. "[R]emoval under § 1442(a)(1) and its predecessor statutes was meant to ensure a federal forum in any case where a federal official is entitled to raise a defense *arising out of his official duties*." *Winters*, 149 F.3d at 400 (quoting *Arizona v. Manypenny*, 451 U.S. 232, 241 (1981) (emphasis in original)). "It is important to note that the defendants need not prove the asserted defense, but need only articulate its 'colorable' applicability to the plaintiff's claims. 'One of the primary purposes of the removal statute—as its history clearly demonstrates—was to have such defenses litigated in the federal courts . . .. In fact, one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court. *The officer need not win his case before he can have it removed.*'" *Winters*, 149 F.3d at 400 (quoting *Willingham v. Morgan*, 395 U.S. 402, 407 (1969)); *see generally Latiolais*, 951 F.3d at 297 (describing the standard).

32

BNSF asserts the colorable federal defense of preemption based on the ICCTA and the Hazardous Materials Transportation Act ("HMTA"). Barnes disagrees and cites the several previous orders by federal courts and Montana courts rejecting BNSF's preemption arguments. (Doc. 23 at 14-15.) The Court concludes that these defenses prove colorable based on the low standard set out by the U.S. Supreme Court for removal based on § 1442(a)(1). *See Manypenny*, 451 U.S. at 241. BNSF's satisfaction of this factor alone fails to support removal.

The Court additionally notes that Barnes argues BNSF's removal based on federal officer jurisdiction proves untimely as BNSF has long known that it had transported vermiculite to the U.S. Navy. (Doc. 23 at 5-6.) BNSF argues that its removal proves timely even though it had known for decades the relevant federal officer jurisdiction facts. (Doc. 33 at 2.) BNSF asserts that removal proves timely as the *Wells/Walder* opinion clarified Barnes's suit "is 'for or related to an act' under color of federal law" because the Ninth Circuit referred a federal definition of transportation. (*Id*.) The Court concludes that BNSF's argument proves unconvincing and attempts to string together only tenuously related arguments. The Court determines that it proves unnecessary to rule on the timeliness of BNSF's removal as it already has concluded that no federal officer jurisdiction exists in this action.

### III.    FELA Claims

Barnes's motion to remand additionally argues BNSF's removal included "20 cases involving railroad workers with Federal Employers' Liability act ("FELA") claims." (Doc. 6 at 3 n.1.) Barnes contends actions brought under FELA, 45 U.S.C. § 51, "may not be removed" pursuant to 28 U.S.C. § 1445(a). (*Id.*) BNSF argues that several of the actions that Barnes identifies as including FELA claims do not include FELA claims at this point. (Doc. 30 at 1-2.) BNSF further asserts that the Court properly can exercise supplemental jurisdiction over the remaining FELA claims based on its alleged federal officer jurisdiction. (*Id.* at 3-4, citing *Ditcharo v. Union Pac. R.R. Co.*, No. CV 23-7399, 2024 WL 1433652 (E.D. La. Apr. 3, 2024).) The Court concludes it remains improper to exercise supplemental federal jurisdiction over the remaining FELA claims as it already has determined it lacks embedded federal question jurisdiction or federal officer jurisdiction.

## CONCLUSION

The Court determines it proves appropriate to grant Barnes's Motion to Remand. (Doc. 5.) The Court lacks jurisdiction based either on federal question jurisdiction or federal officer jurisdiction. The Court finds this action does not fit into the slim category of federal question/arising-under jurisdiction cases.

BNSF's asserted grounds for removal rely upon its asserted defenses, and, therefore, violate the well-pleaded complaint rule. The Court recognizes that BNSF's

34

asserted federal issue proves actually disputed, but the Court concludes that the issue does not meet the necessarily raised or substantial prongs of the four-part test. BNSF also cannot demonstrate that the issue remains capable of resolution in federal court without disrupting the federal-state balance approved by Congress. The Court lastly determines it cannot properly exercise subject matter jurisdiction based on federal officer jurisdiction as BNSF fails to demonstrate that it was "acting under" a federal officer pursuant to the test or that its challenged actions related to its connection to the federal government. For those reasons, the Court determines that remand proves proper and necessary.

The Ninth Circuit "ha[s] long held that 'removal statutes should be construed narrowly in favor of remand to protect the jurisdiction of state courts.'" *Cnty. of San Mateo*, 32 F.4th at 764 (quoting *Harris v. Bankers Life and Cas. Co.*, 425 F.3d 689, 698 (9th Cir. 2005)). "This rule of construction is based on the long-standing principle that '[d]ue regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which the statute [authorizing removal jurisdiction] has defined.'" *Id.* at 764 (quoting *Healy v. Ratta*, 292 U.S. 263, 270 (1934)). "In keeping with these principles, the [U.S.] Supreme Court has repeatedly affirmed its 'deeply felt and traditional reluctance . . . to expand the jurisdiction of federal courts

35

through a broad reading of jurisdictional statutes.'" *Id.* at 764 (quoting *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374, 389-90 (2016) (citation omitted)). "[The Court's] adherence to this doctrine does not change merely because plaintiffs raise novel and sweeping causes of action." *Id.* at 764. "[The Court] therefore reject[s] the broad interpretations of removal jurisdiction urged on [it] by [BNSF] and [grants the] remand [motion]." *Id.*

DATED this 23rd day of June, 2026.

Brian Morris, Chief District Judge
United States District Courts

36